Daryl Keith WHEATFALL, Appellant,

v.

The STATE of Texas, Appellee.

No. 71390.

Court of Criminal Appeals of Texas,
En Banc.

June 29, 1994.

Robert A. Morrow, Janet Morrow, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Carol M. Cameron, Keno Henderson and Joan Huffman, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of the capital murder of an elderly couple, both murders committed in the same criminal transaction. Tex.Penal.Code Ann. § 19.03(a)(6)(A). After the jury answered the three special issues in the affirmative, the trial court sentenced appellant to death. Tex.Code Crim.Proc.Ann. art. 37.071(b). Appeal to this Court is automatic. Tex.Code Crim.Proc.Ann. art. 37.-071(h). We will affirm.

In a dispute over $50.00, appellant shot an elderly couple in their home in Harris County. Appellant does not challenge the sufficiency of the evidence to support his conviction or sentence of death. He presents fourteen points of error for our review.

## VOIR DIRE

■ In his fifth point of error, appellant complains the trial court erred in overruling his challenge for cause of veniremember Traylor. Specifically, appellant asserts Traylor was unable to follow the law and nullify his answers to the special issues as instructed where he believed that due to mitigating circumstances the defendant should receive a life sentence rather than the death penalty. We have commonly referred to this instruction as a "nullification" instruction. See n. 11, *infra.* Essentially this instruction to the jury, notifies the jury that if they believe, due to sufficient mitigating evidence, that the defendant should receive a life sentence rather than death, they are to answer one of the special issues in the negative. See *Robertson v. State,* 871 S.W.2d 701, 710–711 (Tex.Crim. App.1993).

■ A defendant may challenge a potential juror for cause where that individual has a "bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offenses for which the defendant

is being prosecuted or as a mitigation therefore or of the punishment therefore." Tex. Code Crim.Proc.Ann. art. 35.16(c)(2). When reviewing a court's ruling on a challenge for cause, we review the record as a whole to determine whether there is support for that ruling. *Satterwhite v. State*, 858 S.W.2d 412, 415 (Tex.Crim.App.1993); *Moody v. State*, 827 S.W.2d 875, 884 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). As the court is in the best position to view the demeanor of the veniremember and to determine his or her credibility, we give great deference to the court's ruling. *Satterwhite*, 858 S.W.2d at 415. And absent an abuse of discretion, such a ruling will not be disturbed. *Ibid.; Williams v. State*, 773 S.W.2d 525, 536 (Tex. Crim.App.1988), *cert. denied*, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 207 (1989). In this instance, no abuse of discretion is shown.

■ Either as a result of the questions or the complexity of these questions, Traylor indicated a misunderstanding as to his ability to change the answers to the special issues based upon mitigating evidence. However, after being informed of the law and questioned by the court Traylor indicated that he would change his answer to the special issues if based upon that mitigating evidence he believed the defendant should be sentenced to life rather than death. This contradicted his original answers to questions by appellant. We are therefore unable to conclude that the court abused its discretion in its ruling. Appellant's fifth point of error is overruled.

■ In the fourth point of error, appellant also contends the trial court erred in attempting to commit veniremember Traylor to a specific set of facts. We need not address appellant's complaint as he failed to properly preserve error. Again, this questioning concerned Traylor's ability to "nullify" his answers to the special issues. After questioning by appellant, Traylor indicated an inability to change his answers to the special issues based upon a personal belief the defendant should not be sentenced to death. Appellant challenged Traylor for cause "because I

know the judge wants to talk to you right now." In an attempt to explain the applicable law, the trial court posed several hypothetical questions to Traylor. After a considerable amount of questioning by the trial court (encompassing forty pages of the statement of facts), appellant objected to the trial court's hypothetical and to its attempt to commit Traylor to a particular set of facts. Appellant's objection was not timely. The objection must be made at the earliest possible opportunity. *Martinez v. State*, 867 S.W.2d 30, 35 (Tex.Crim.App.1993); *Zimmerman v. State*, 860 S.W.2d 89, 100 (Tex. Crim.App.1993); Tex.R.App.Proc. 52(a). Appellant's fourth point is overruled.

■ In point of error six, appellant contends the trial court erred in overruling his challenge for cause to veniremember Hill because she equated proof beyond a reasonable doubt with proof by a preponderance of the evidence. A potential juror is challengeable for cause if she is unable to require the State to prove each element of the offense beyond a reasonable doubt.[1] *Cantu v. State*, 842 S.W.2d 667, 682–685 (Tex.Crim.App. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Lane v. State*, 822 S.W.2d 35, 46–48 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1968, 118 L.Ed.2d 568 (1992).

During examination by the State, Hill indicated that to her proof beyond a reasonable doubt means, "[y]ou have to have a lot of proof." She further stated that she didn't just have to be satisfied but rather she would have to be "convinced." Later veniremember Hill stated, in response to a question by appellant, that she would find them guilty if a defendant were only "fifty-one" percent guilty. Based upon this response, appellant challenged Ms. Hill for cause.

The State again questioned potential juror Hill. During this exchange the following questions and answers were elicited:

Q: Ms. Hill, I think one of the very first questions that, or things that we talked about was I was talking to you about beyond a reasonable doubt. I recall you

---

1. Appellant's trial occurred prior to our decision in *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App. 1991). Therefore, a definition of that term was not required in his trial.

telling me something to the effect that you have to be convinced and you have to be sure; and I think you said real sure, if I recall what you said. Is that basically what you said?

A: That's what I said. Yeah, I have to be sure before I can.

Q: Yeah, you have to be sure.

A: Yeah.

Q: Mr. Cossum was explaining to you the difference between what they do over in the civil court, that's just a preponderance of the evidence. That just means that, you know, you may have some doubts, they may be real big doubts, but if you think one side has given you more evidence than the other, then you vote for the side that has the most credible evidence, okay. Remember when we talked about in a criminal case this side doesn't have to do anything at all. You may not hear one word from them. They may never open their mouth, they may not even cross examine the witnesses that I put on. They don't have to do anything; okay? So that might mean that they have zero on their side as far as evidence, okay? I may be the only one who puts on testimony that you believe. That doesn't mean that I win the case. It means you listen to the evidence that was presented and then you decide whether you believe, whether you are sure, real sure, like you said, or whether I prove to you beyond a reasonable doubt that the defendant committed the crime that I allege he has committed in the indictment. You see how that works?

A: Uh-hum.

Q: So it's not a matter of, okay, they got this much on this side, on the State side, and they have this much on the Defense side, I'm just going to see which one weighs the most. You see how it's not that process?

A: (Nodded).

Q: It's something more than that. It's likening at what I did and determining from what I did if I've proven my case to you. And it doesn't matter what they do. Do you see the difference in the two systems?

A: Uh-hum.

Q: Can you assure us that you will listen to all the evidence, because it may be the Defense puts on no evidence, and if they do, you have to consider that, but that never takes away from what I have to do, and that's proving to you beyond a reasonable doubt that he committed the crime.

A: Uh-hum.

Q: Can you assure us that whatever beyond a reasonable doubt means to you—and we can't ask you to give us a certain percentage. As long as you realize that I have to prove to you beyond any reasonable doubt, as long as you understand that and assure us that you will do that, then that's all you have to be able to do to qualify as a juror. Can you assure us that you can do that?

A: I can.

At this point, the trial court overruled appellant's challenge for cause, and appellant continued his voir dire of Hill. During further examination though, the veniremember again stated that she would have to be more than "half sure" to convict someone, indicating that she equated proof beyond a reasonable doubt with proof by preponderance of the evidence, that is, both meant greater than fifty percent. Appellant renewed his objection. Again the trial court overruled this objection.

■ Veniremember Hill's final testimony equating proof beyond a reasonable doubt with proof by a preponderance of the evidence is troubling. Had there been no other testimony on the subject, she would have been challengeable for cause. However, reviewing the *entire* voir dire, we cannot hold that the trial court abused its discretion in overruling appellant's challenge for cause. Hill stated that she would have to be "real sure" or "convinced" before she would find the defendant guilty. Additionally, when the State explained the differing standards of proof to Hill, she stated she understood the differing burdens in civil and criminal law, and that she would require the State to prove the defendant committed the crime beyond a reasonable doubt. Our review of the record indicates veniremember Hill vacillated in her responses concerning the varying burdens of

proof. Appellant's sixth point of error is overruled.

In the seventh point of error, appellant alleges the trial court reversibly erred in denying his request that veniremember Sorrells explain what "deliberately" meant to her. Appellant asked, "[c]an you tell me what deliberate means to you?" The State objected, and the trial court sustained this objection.

■ We have held on numerous occasions that a trial court does not abuse its discretion when it refuses to permit defense counsel from inquiring into a potential juror's definition of "deliberately." *Trevino v. State*, 815 S.W.2d 592, 608–610 (Tex.Crim.App.1991), *vacated on other grounds,* — U.S. ——, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992); *Milton v. State*, 599 S.W.2d 824, 826 (Tex.Crim.App.) (en banc), *cert. denied,* 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1980); *Esquivel v. State*, 595 S.W.2d 516, 525 (Tex.Crim.App.) (en banc), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980); *Chambers v. State*, 568 S.W.2d 313, 323 (Tex.Crim.App. 1978) (en banc), *cert. denied,* 440 U.S. 928, 99 S.Ct. 1264, 59 L.Ed.2d 484 (1979), *overruled on other grounds; see also Battie v. State,* 551 S.W.2d 401, 405 (Tex.Crim.App.1977) (No abuse of discretion in refusing counsel from asking potential juror to define "criminal acts of violence."). The rationale for this prohibition is not that these questions are improper, *Gardner v. State*, 730 S.W.2d 675, 688 n. 7 (Tex.Crim.App.1987), *cert. denied,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1988), but rather if counsel were to be permitted to inquire into the definition of every term during trial, voir dire would become endless. *Woolridge v. State*, 827 S.W.2d 900, 905 (Tex. Crim.App.1992); *Trevino*, 815 S.W.2d at 610; *Milton*, 599 S.W.2d at 826. Appellant was not prevented from propounding questions concerning the difference between "deliberately" and "intentionally." Specifically because of this fact, we find that the trial court

did not abuse its discretion in restricting appellant from inquiring into Sorrells' definition of "deliberately." *Trevino*, 815 S.W.2d at 608–610; *Milton*, 599 S.W.2d at 826. Appellant's seventh point of error is overruled.

■ In appellant's twelfth point of error, he argues the State's peremptory challenge to veniremember Stapler was based on racial reasons, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To invoke the protections set forth in *Batson*, appellant must first make a *prima facie* showing that the State's use of peremptory challenges is racially motivated. *Chambers v. State*, 866 S.W.2d 9, 23 (Tex.Crim. App.1993). The burden then shifts to the State to rebut this showing with a race-neutral explanation for its challenge. The defendant may rebut this explanation. The trial court must then determine whether the defendant has established that the State's challenge was in fact racially motivated. Because the State offered a race-neutral explanation we will not review the trial court's *prima facie* ruling, as it is moot. *Ibid.*

■ The trial court determined that the State's challenge was, in fact, not racially motivated. On appeal, this finding of fact is accorded great deference and will not be reversed unless clearly erroneous. *Ibid.; Adanandus v. State*, 866 S.W.2d 210, 224 (Tex.Crim.App.1993). In this instance we are unable to say the trial court abused its discretion.

■ The prosecutor challenged Stapler because "she was a weak juror for the state." One example of this weakness was Stapler's contradictory answers on her questionnaire and during voir dire. For example, in her questionnaire, Stapler stated that she did not know anyone who had been arrested or imprisoned. However, during voir dire she stated she had second cousins who had been in prison—one for auto theft and the other for a drug offense.[2] This vacillation was

---

2. In response, appellant directs our attention to other potential jurors who had relatives in prison yet were not peremptorily challenged. Appellant's argument is based on a comparative analysis of two other veniremember's responses to similar questions. However, the race of these potential jurors appears nowhere in the record.

Because these veniremembers may be of the same race as Stapler's and therefore their answers do not show disparate treatment, we are unable to compare their answers. However, the State's rationale for their challenge was based not on her answer to that question, but rather the differing answers she gave in her questionnaire

cited as one of the reasons the prosecutor believed Stapler would be a "weak" juror.

The prosecutor indicated a second instance of Stapler's infirmity. Stapler classified herself on her questionnaire as "liberal." When asked during her voir dire why she classified herself that way, Stapler could not give any reasons for her answer. As appellant points out Stapler "retreated from that description and was 'nervous that day' when filling out the form." In fact, Stapler was unable to indicate any political or social leanings except that she was probably a Democrat because her parents were Democrats. Stapler was thirty-eight.

Stapler's answers on her questionnaire and her answers to the prosecutor during voir dire differed. A potential juror's contradiction in his or her answers to questions in questionnaires and during voir dire could indicate an inability to be resolute during deliberations. This might indicate to an attorney that the potential juror would vacillate in his or her verdict during deliberations. This weakness is a sufficient explanation for the State to exercise a peremptory challenge on Stapler. *See Satterwhite v. State*, 858 S.W.2d 412, 424 (Tex.Crim.App.1993) (prosecutor struck potential juror because "she had failed to fully complete her juror information card." She had not answered question on previous jury service, and voir dire indicated she had served on both a civil and criminal trial.) Therefore, we are unable to say the trial court was clearly erroneous in denying appellant's *Batson* motion. Appellant's twelfth point of error is overruled.

## EVIDENTIARY RULINGS

In his eighth point of error, appellant argues the trial court erred in permitting the

State to introduce Detective Stephens' testimony to impeach appellant. Appellant alleges that Stephens' testimony in fact amounted to comments on appellant's post arrest silence in violation of the U.S. Constitution. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). We need not reach the propriety of this testimony as appellant has failed to preserve error.

■ Appellant never objected to the testimony of his post arrest silence by the detective during trial on the grounds now urged on appeal. Appellant's only objection at trial may have been to the voluntariness of his confession.[3] However, this objection does not comport with appellant's complaint on appeal. *See Hughes v. State*, 1994 WL 124305, at 15 (Tex.Crim.App.1994); *San Miguel v. State*, 864 S.W.2d 493, 496 (Tex.Crim. App.1993); *Camacho v. State*, 864 S.W.2d 524, 533 (Tex.Crim.App.1993). Appellant's eighth point of error is overruled.

■ In the ninth point of error, appellant contends the trial court erred in excluding testimony concerning an uninvestigated allegation that a second man looked like the composite drawing which purported to represent appellant. Appellant called as a witness, the prosecuting attorney, to examine her concerning a portion of the Houston Police Department offense report. The copy of the handwritten note stated that "Michael Radford used to live on Southford, parents still do, looks like composit (sic)." The prosecutor confirmed the existence of the note, agreed to testify if asked by the court, but

---

and during voir dire. Because that rationale is unaltered by the responses of these other venire-members we will continue and address the State's race-neutral explanation.

**3.** During trial there was a hearing to determine *only* the voluntariness of appellant's statements *to the detective. Later, counsel objected "to any conversation"* with the detective when appellant testified. The actual exchange occurred as follows:

Q. [By the State:] Do you remember that conversation?
A. [By Appellant:] Yes?

Q. Do you remember that you were given your rights, read your Miranda warnings?
MR. DAVIS [Defense Counsel:] I'm going to object to any conversation.
A. No, I wasn't.
MR. DAVIS: Object.
THE COURT: Overruled.
The objection to "any conversation" is not sufficient to notify the trial court of the specific objection by appellant. At most it may have been sufficient to notify the court that appellant was again questioning the voluntariness of the confession.

argued that any statements by her would be hearsay. Additionally, the prosecutor argued that sergeant Ramsey was still available to testify as to his knowledge concerning the note and any follow-up investigation concerning that note.

Appellant contends the statement was relevant to show the district attorney's office "had information there was someone else with a like composite." To support his relevance argument, appellant cites several cases in which our Court or other courts of appeals in this state have allowed examination of witnesses concerning misidentification. *See Jackson v. State,* 551 S.W.2d 351 (Tex.Crim. App.1977); *Hill v. State,* 783 S.W.2d 257 (Tex.App.—Texarkana 1989, no pet.)

While this may have been relevant, appellant's argument fails to address the hearsay issue. The prosecutor would have been unable to testify concerning the note or its contents. She did not write the note and she had no knowledge of whether the police had done a follow-up examination of this second individual. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex.Crim.Evid.R. 801(d). The prosecutor's testimony would have constituted a hearsay statement. The trial court did not abuse its discretion in refusing to admit such testimony. Appellant's ninth point of error is overruled.

In the tenth point of error, appellant complains he was denied due process of law "when the prosecutor testified at length about the relevance and significance of numerous State's exhibits." The exhibits at issue concerned appellant's extensive criminal background. They included his pen packet, probation records, and juvenile records. After the documents were admitted, the trial court permitted the prosecutor to publish the documents to the jury. At this point the prosecutor began summarizing the contents of these records: "Ladies and gentlemen, at this time I'll attempt to go through these documents with you to explain what they are and what their significance is." The prosecutor proceeded to read selected portions of approximately eighteen exhibits which contained appellant's prior criminal history.

██ Few Texas cases have ever discussed the manner of "publishing" to the jury written documents which have been admitted into evidence. Oral evidence is heard immediately by the jury, visual evidence is seen immediately by the jury, but written evidence must be presented by some other party or given to the jury before they learn of its substance. · There appear to be no logical impediments to reading such evidence either by counsel or witness at the time it is declared admissible.

Common practice in state and federal courts appear to be that when a document is admitted into evidence, counsel[4] or a witness[5] can read the document aloud to the jury.[6] The rules of evidence[7] and authors of

4. *See e.g., United States v. Rubin,* 609 F.2d 51, 61 (2nd Cir.1979); *United States v. Stewart,* 576 F.2d 50, 52 (5th Cir.1978); *United States v. Bartlett,* 449 F.2d 700, 706 (8th Cir.1971); *South v. United States,* 368 F.2d 202, 205 n. 3 (5th Cir. 1966); *People v. Williams,* 44 Cal.3d 883, 245 Cal.Rptr. 336, 751 P.2d 395, 426 (1988); *State v. Mason,* 186 Conn. 574, 442 A.2d 1335, 1338 (1982); *Young v. United States,* 639 A.2d 92, 94 n. 3 (D.C.App.1994); *Stewart v. Rice,* 120 Idaho 504, 817 P.2d 170, 173 (1991); *Miller v. State,* 543 N.E.2d 639, 641 (Ind.1989); *State v. Graverholz,* 232 Kan. 221, 654 P.2d 395, 398 (1982); *Moody v. Pulte Homes, Inc.,* 423 Mich. 150, 378 N.W.2d 319, 324–325 n. 3 (1985); *Boyd v. State,* 92 Nev. 73, 545 P.2d 202 (1976); *Oberg v. Honda Motor Co., Ltd.,* 316 Or. 263, 851 P.2d 1084, 1101 (Or.1993) (In Banc) (Peterson, J. dissenting); *Shaffer v. State,* 640 P.2d 88, 105 (Wyo. 1982).

5. *See e.g., United States v. Carr,* 965 F.2d 408, 411 (7th Cir.1992); *Herman v. Butterworth,* 744 F.Supp. 1128, 1132 (S.D.Fla.1989); *Commonwealth v. Alston,* 461 Pa. 664, 337 A.2d 597, 598 (1975); *State v. Rutchik,* 116 Wis.2d 61, 341 N.W.2d 639, 647 (1984).

6. Where counsel was reading only a portion of the document into the record and the opposing counsel desired the entire document to be read, opposing counsel need only object to the incomplete reading.

7. *See e.g.,* Tex.R.Crim.Evid. 106 ("When a writing ... is introduced by a party, an adverse party may at that time introduce any other part or any other writing ... which ought in fairness to be considered contemporaneously with it."); Rule 803(5) ("If admitted, the memorandum or record may be read into evidence but may not itself be

treatises[8] presume this to be the case. This logically follows from the procedure of a case. Exhibits are marked, identified, and authenticated. The jury, hearing constant references to the document, endures the legal procedure so that they may assimilate the evidence. Upon admission by the trial court, the jury is permitted to access the evidence in some manner. Access to the evidence at the time of its admission permits the parties to build their cases during trial.

■ There are endless variations on methods of presentation that might be attempted, including stopping a trial to allow the jury to read the exhibit or multiple copies of the exhibit, using an overhead projector to display a copy of the exhibit, or allowing a witness or counsel to read the document to the jury. Rather than cease a trial for an undetermined amount of time, it is sometimes necessary to the orderly presentation of a party's case to read a selected portion of an admitted exhibit to the jury. The manner and means of the presentation of documentary evidence to a jury is best left to the sound discretion of a trial court. *See* West, *Texas Digest 2d,* Criminal Law, § 633(1); *cf. Suiter v. State,* 165 Tex.Cr.R. 578, 310 S.W.2d 81, 82 (1958) (trial court enjoys broad discretion in the conduct of trial and questioning of witnesses); *Deams v. State,* 159 Tex.Cr.R. 496, 265 S.W.2d 96, 98 (1954) (trial court has broad discretion in the conduct of trial and

examination of witnesses). On appeal, the trial court's ruling should not be disturbed absent an abuse of discretion.

■ Upon careful review of the record, we do not believe the trial court abused its discretion in permitting the prosecutor to read portions of the admitted exhibits into evidence.[9] Accordingly, appellant's tenth point of error is overruled.

In appellant's eleventh point of error, he argues the trial court erred in admitting into evidence a summary of appellant's violent criminal history. Essentially, this "evidence" consisted of five hand-written pages of appellant's prior violent and criminal history. The pages contained the dates of each infraction as well as notes describing them. *No* witness testified individually as to this list. Nor does the record indicate the lists were used as demonstrative evidence. *See Speier v. Webster College,* 616 S.W.2d 617, 618–619 (Tex.1981) (within the discretion of the trial court, charts or diagrams designed to emphasize the testimony of witnesses are admissible into evidence, assuming the witnesses' testimony is already before the jury). We are uncertain as to what theory the State was relying upon in their attempt to introduce their summary of the evidence or upon what basis the trial court admitted the exhibits. However, we will address the ground

---

verse party."); *and* Rule 803(18) ("If admitted, the statements [in a Learned Treatise] may be read into evidence but may not be received as exhibits.")

8. *See e.g.,* Fredrick Moss, *Beyond the Fringe: Apocryphal Rules of Evidence in Texas,* 43 Baylor Law Review 701, 727 (1991) ("Every major treatise writer assumes, usually without supporting citations, that once admitted, a document can be read to the jury by counsel or witness."); 5 William V. Dorsaneo, *Texas Litigation Guide* § 120A.50[2], at 120A–79 (1991) (same); Walter E. Jordon, *Texas Trial Handbook* § 180, at 387 (1981) ("After its admission the document may be exhibited to the jury or read to them, as counsel prefers."); 1 Roy R. Ray, *Law of Evidence,* § 21, at 23 (Texas Practice 3d ed. 1980) ("Where evidence is received and is a writing counsel may read it to the jury.")

9. Appellant also argues that when the prosecutor read portions of the documents into evidence she

became a witness during the trial. For example, appellant complains that the prosecutor explained probation. The record indicates that she stated exhibit 70 was a judgment of juvenile probation, signed by the judge, probation officer, defendant, and his mother. The prosecutor also read a few of the conditions of probation. But from the record this appears to be a true recitation, albeit not a complete one, of the exhibit. Therefore, we are unable to say that by reciting portions of the exhibits, the prosecutor turned "argument" into "testimony."

We recognize that often in the presentation of this evidence to the jury, counsel or a witness may use extra verbiage to ease the transition of the recitation of a document to verbal communication. However, nothing in this case indicates that such extra verbiage ever rose to a level that prejudiced appellant or transformed the statements from a recitation of the admitted document to argument by the communicator. Again, we reiterate, the control of the manner and means of publishing the admitted exhibit to the jury is best left to the trial court.

upon which the parties apparently relied at trial and on appeal: that the exhibits were used as summaries.

■ At the conclusion of the State's case during punishment, and prior to any defense evidence, the State moved to admit these lists as a "summary" of appellant's prior violent history. The exhibits were admitted over objection. On appeal the State argues these lists were admissible as a summary under Rule 1006 of the Texas Rules of Criminal Evidence. Rule 1006 states:

> The contents of voluminous writings, recordings, or photographs, otherwise admissible, which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

While rule 1006 clearly contemplates the admission of summaries in certain instances, the rule in no way indicates that a prosecutor can summarize her case on legal paper and submit those documents to the trial court as "evidence." [10] The adversarial system permits such summaries by one side during closing arguments, but they are arguments and not admitted as evidence to the jury. Admission of these documents under this theory was clearly error.

Having determined the admission of such "summaries" to be error, we must determine whether that error was harmless beyond a reasonable doubt. Tex.R.App.P. 81(b)(2). Appellant contends harm can be illustrated by the jury's request during deliberations for the prosecutor's "exhibits" of violent acts, as well as the fact that there were several mischaracterizations of the evidence contained within the five documents.

■ While the jury's request to see the summaries could in some instances indicate harm, in this instance such was not the case. The State's evidence concerning his past violent acts was extensive. The lists included nineteen instances of past proven criminal activity, ranging from driving with a suspended license to·shooting three individuals, one of which died as a result of these gunshot wounds. All evidence in the exhibits was duplicitous of other evidence already presented during the punishment phase. The jury heard extensive testimony concerning an event in which appellant shot three people, killing one. The eyewitnesses testified that one of those three individuals shot was also stabbed twenty-three times by appellant's cohort. The state's exhibits also contained numerous infractions which occurred in various prisons by appellant. Several witnesses testified concerning these altercations at trial.

■ Appellant also contends that he was harmed because there were several errors in the summary. Appellant basically contests two items in the five page summary. The first error in the summary was a crime listed as an aggravated robbery. In fact, the stipulation of evidence in that case indicated that appellant stole cookies valued between one and five dollars. While the juvenile petition did allege appellant placed the complainant in imminent fear of injury with the use of a knife while he robbed the complainant, that is not evidence of the crime. This juvenile petition was admitted into evidence. However, we do not believe this error was harmful in any way to appellant. The jury was given the actual underlying documents to review which correctly stated for what appellant was convicted, and the jury had been correctly informed this was only an allegation and not the stipulation of evidence when the prosecutor published the documents to the jury. When viewed in the context of the previous statements of the prosecutor and the fact that the jury had access to the underlying documents, we believe this error in the summary was harmless beyond a reasonable doubt.

■ Appellant also complains of a second error in the summary. Appellant argues the summary incorrectly notes that he stabbed Kenneth Waddell twenty-three times. How-

---

10. Had the State followed the procedures dictated within Rule 1006 for the admission of summaries of voluminous records, that summary may have been admissible. However, that was not the case.

ever, we do not agree with appellant's that in light of the evidence presented at trial that this was a logical interpretation. The last item in the summary states,

12–11–90 [Appellant] *shoots:*

Brenda Parker: in the head & shoulder

David Clouden: in the face

Roland Davis: in the head & abdomen causing his death.

Kenneth Waddell—in the course of

the same criminal transaction is

stabbed 23 times and shot in the leg.

The first half of this note correctly indicates appellant shot the three named individuals. However, in the second half it states that Waddell was stabbed in the course of the same criminal transaction. The logical interpretation of the separation of the two items and the phrases used would not lead a juror to believe that appellant stabbed Waddell. This is even more true when we review the evidence presented at trial. The jury heard extensive evidence of this crime during punishment. The jury heard eyewitness testimony that appellant shot Parker, Clouden and Davis. They heard testimony that his accomplice had a knife and that the accomplice stabbed Waddell. Therefore, in light of the manner in which the summary described the incident and in light of the evidence presented at trial, we do not believe a reasonable jury would believe appellant stabbed Waddell 23 times.

Therefore because all the evidence presented was duplicitous of other evidence already presented, any error in the admission of this "summary" was harmless beyond a reasonable doubt. Tex.R.App.P. 81(b)(2). Appellant's eleventh point of error is overruled.

## CHARGE ISSUES

In appellant's first point of error, he contends the trial court erred in refusing to submit a special issue concerning mitigation. Rather than submit the requested third special issue, the trial court included a "nullification" instruction in the punishment charge.[11] We have held these instructions are sufficient to meet the constitutional requirements of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *Robertson*, 871 S.W.2d at 710–711; *Coble v. State*, 871 S.W.2d 192, 206–207 (Tex.Crim.App.1993), *cert. filed; San Miguel v. State*, 864 S.W.2d 493, 495 (Tex.Crim.App.1993).

Appellant argues the "nullification" charge calls for the jurors to act against their natural inclinations by asking them to alter one of their answers to the special issues. Therefore, the charge enhanced the risk of an unwarranted sentence of death. To support this argument, appellant cites to *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). However, we believe *Beck* is inapplicable to the issue at hand. In *Beck*, the Supreme Court reversed an Alabama capital conviction because a state statute improperly prevented a trial court from including a lesser included non-capital offense. The Supreme Court recognized the difficulty presented to a jury where their only choice lies between conviction of a capital offense where the death sentence appears mandatory and acquittal of that offense. *Beck*, 447 U.S. at 642–643, 100 S.Ct. at 2392–2393. The unavailability of the third option may encourage the jury to convict a defendant for an "impermissible reason—its belief that the defendant is guilty of some serious

11. The court instructed the jury that:

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, then a negative finding should be given to one of the special issues, regardless of what the jury found the answer to the special issue to be.

crime and should be punished" or the jury may acquit the defendant for an "equally impermissible reason—that whatever his crime, the defendant does not deserve death." *Ibid.*

■ Appellant contends a jury would be likely to resolve any doubts in favor of its initial answer, rather than changing and nullifying one of those answers. However, we do not agree with appellant that such would be the case. Unlike in *Beck*, the jury is given a middle ground for their deliberations. Where a jury's reasoned moral response was that the defendant should not be sentenced to death they may give effect to such a belief through the judge's "nullification" instruction. This prevents the jury from being placed in the precarious position of answering the special issues when they believe a defendant committed the act deliberately, without provocation, and is a future danger, but they also believe that defendant should not be sentenced to death. The "nullification" instruction was sufficient to meet these constitutional commands. Appellant's first point of error is overruled.

■ In point of error two, appellant argues the trial court erred in its wording of the third special issue concerning provocation. Tex.Code Crim.Proc.Ann. art. 37.-071(b)(3). Over objection, the trial court submitted the following special issue to the jury:

> Do you believe beyond a reasonable doubt the conduct of the defendant, Daryl Keith Wheatfall, in killing the deceased, James M. Fitzgerald, Sr., and the deceased, L.B. Fitzgerald, was unreasonable in response to the provocation, if any, by the deceaseds?

At issue is the trial court's inclusion of Mrs. Fitzgerald in the special issue. Appellant accurately points out that when a defendant is convicted of capital murder pursuant to section 19.03(a)(6) of the penal code, the court should submit the special issues "only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment." Tex.Code Crim. Proc.Ann. art. 37.071(f). In this instance Mr. Fitzgerald, Sr. was the first named in the indictment. Therefore, the trial court erred in including Mrs. Fitzgerald in the special issue. Consequently, we must determine whether the court's error harmed appellant. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1984) (on rehearing); Tex.R.App. Proc. 81(b)(2).

■ Appellant contends that while the addition of Mrs. Fitzgerald was added to increase the State's burden of proof, that was not the effect. Appellant argues that because Mrs. Fitzgerald was "old and frail" the State wanted the jury to focus on the reasonableness of appellant's conduct with regard to Mrs. Fitzgerald and not her husband. However, appellant can point to *no* evidence of provocation beyond a mere unsubstantiated supposition that Mr. Fitzgerald may have done something to provoke appellant. The only evidence of provocation by Mr. Fitzgerald is that when he was seated in the living room, he stood up and walked towards an exit in the back of the room and away from appellant despite orders to the contrary from appellant. Appellant's accomplice followed him, and escorted him back to the couch at gunpoint. There is also evidence that there may have been a struggle between the *accomplice* and Mr. Fitzgerald. However, this struggle, if it occurred, was concluded prior to appellant's shooting of Mr. Fitzgerald. There is no evidence that Mr. Fitzgerald provoked appellant in any manner, therefore, the trial court was not required to submit the special issue concerning provocation. As no special issue was necessary, appellant was not harmed by the erroneous inclusion of the instruction in the charge. Appellant's second point of error is overruled.

In appellant's third point of error, he complains the capital punishment proceedings violated the Eighth and Fourteenth Amendments of the United States Constitution because the trial court instructed the jury that they were "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all the evidence before you and in answering the special issues." Specifically, appellant complains an instruction to the jury to disregard "sympathy" violates *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

■ This is our first opportunity to determine the constitutionality of an antisympathy charge. Initially, we note the trial court's charge was sufficient to meet *Penry*'s commands concerning mitigating evidence. Where a jury charge is sufficient to meet the commands of *Penry*, it does not violate the Eighth or Fourteenth Amendments of the United States Constitution to instruct the jury "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering" the evidence and answering the special issues.[12]

The trial court's instruction in this case is virtually identical to the instruction upheld in *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Appellant, similar to the California Supreme Court, errs in focusing his argument on the particular word "sympathy." *Brown*, 479 U.S. at 541, 107 S.Ct. at 839. As the Supreme Court noted,

> By concentrating on the noun "sympathy," respondent ignores the crucial fact that the jury was instructed to avoid basing its decision on *mere* sympathy. Even a juror who insisted on focusing on this one phrase in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase.

*Brown*, 479 U.S. at 542, 107 S.Ct. at 840.

■ By limiting a jury's emotional response to our special issues, a trial court limits emotional responses in favor of the defendant *and* in favor of the victims of the crime. However, it does not follow that by limiting a juror's sympathy towards the defendant the court is also limiting that juror's consideration of evidence which may mitigate against the imposition of the death penalty. As Justice O'Connor explicated in her concurring opinion in *Brown*,

> Because the individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence, I agree with the Court that an instruction informing the

jury that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution.

479 U.S. at 545, 107 S.Ct. at 841 (O'Connor, J. concurring). Because this instruction does not limit the juror's consideration of mitigating evidence, the instruction does not run afoul of *Penry, supra.*

Appellant's contention strikes at *how* our state courts can guide a jury's consideration of mitigating evidence. In *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 1259, 108 L.Ed.2d 415 (1990), the Supreme Court considered whether a jury could be instructed to "avoid any influence of sympathy." While this instruction appears more troubling, the Court held Parks was not entitled to relief because to grant Parks relief would be to create a "new rule" of constitutional law under *Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989) (plurality opinion) and *Penry, supra.* However, in denying Parks relief, the Court explained:

> Parks asks us to create a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider the mitigating evidence. There is a simple and logical difference between rules that govern what factors the jury must be permitted to consider in making its sentencing decision, and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision. We thus cannot say that the large majority of federal and state courts that have rejected challenges to antisympathy instructions similar to that given in Parks' trial have been unreasonable in concluding that the instructions do not violate the rule of *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] and *Eddings* [*v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)].

12. Today, we only pass upon the constitutionality of this portion of the charge. We have not been asked to address the statutory authority of the trial court to give such an instruction.

*Parks,* 494 U.S. at 490, 110 S.Ct. at 1261. We hold the antisympathy instruction in this case does not violate the Eighth or Fourteenth Amendments nor does it violate the Supreme Court's commands in *Penry, supra.*[13]

■ Appellant also contends that we should consider the changing membership of the Supreme Court in our review of their precedent. To accept appellant's proposition, this Court would be forced to reconsider every decision of the Supreme Court or our Court upon changes in membership. Such an endeavor would defeat one of the essential purposes of *stare decisis. See Burnet v. Coronado Oil and Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting) ("*[S]tare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right."); *State v. Gonzalez,* 855 S.W.2d 692, 696 (Tex. Crim.App.1993) ("The doctrine of *stare decisis* requires a compelling reason to change an accepted standard of review."); *Gearheart v. State,* 81 Tex.Cr.R. 540, 197 S.W. 187, 188–189 (1917) ("[W]hen a rule has been once deliberately adopted and declared and uniformly followed, it should not be abandoned except upon the most urgent reasons."); B. Cardozo, *The Nature of the Judicial Process* 150 (1921) ("The situation would ... be intolerable if the [periodic] changes in the composition of the court were accompanied by changes in its rulings. In such circumstances there is nothing to do except to stand by the errors of our brethren of the [time] before, whether we relish them or not."). We refuse to depart from *stare decisis* on these grounds. Appellant's third point of error is overruled.

Appellant's judgment of conviction is affirmed.

CLINTON, J., concurs in the result.

13. While not constrained in any manner by the decisions of our sister courts in this country, we do note that the states that have considered this question have also found this does not violate the Eighth or Fourteenth Amendments of the United States Constitution. *State v. Young,* 853 P.2d 327, 362–363 (Utah 1993); *Powell v. State,* 108 Nev. 700, 838 P.2d 921, 930 (1992); *Willie v. State,* 585 So.2d 660, 677 (Miss.1991); *State v.*

BAIRD, Judge, concurring.

I cannot join that portion of the majority opinion addressing of appellant's seventh point of error. Majority op. at 835. Appellant contends the trial judge erred in denying his request of veniremember Sorrell to explain what "deliberately" meant to her. The majority states:

> ... The rationale for this prohibition is *not* that these questions are improper but rather that if counsel were to be permitted to inquire into the definition of every term during trial, voir dire would be endless.

Majority op. at 835. (Citations omitted and emphasis added.).

In support of this statement the majority relies on *Woolridge v. State,* 827 S.W.2d 900 (Tex.Cr.App.1992). However, *Woolridge* does not support the majority's position. In *Woolridge,* we addressed the issue of whether the trial judge had abused his discretion in refusing to permit the defendant to question the venire on the meaning of reasonable doubt. *Id.,* 827 S.W.2d at 904. In *Woolridge* the State argued that to allow questioning of the each prospective juror of undefined terms would unnecessarily prolong the voir dire process. *Id.,* 827 S.W.2d at 905. And that is the position now taken by the majority. However, we expressly *rejected* that argument in *Woolridge.*

> We recognize that any proper question has the potential to lengthen the voir dire portion of the trial. However, it is improper for a trial judge to impose restrictions based on the mere possibility that the otherwise proper question might lengthen then process. The trial judge must first allow the question, and may later curtail similar questions if the voir dire process proves to be unduly lengthy. *See Battie,* 551 S.W.2d at 403. Also, trial judges may prohibit an otherwise proper question

*Combs,* 62 Ohio St.3d 278, 287–288, 581 N.E.2d 1071, 1080 (Ohio 1991); *People v. Davis,* 794 P.2d 159, 193 (Colo.1990); *State v. Boyd,* 797 S.W.2d 589, 598–599 (Tenn.1990); *State v. Greenwood,* 115 Wash.2d 1008, 382–385, 798 P.2d 780, 782–783 (Wash.1990); *People v. Malone,* 47 Cal.3d 1, 39–43, 252 Cal.Rptr. 525, 548–550, 762 P.2d 1249, 1272–1273 (Cal.1988).

which substantially repeats others posed by the same party, *Allridge v. State*, 762 S.W.2d 146, 167 (Tex.Cr.App.1988), or when the prospective juror has stated his position clearly, unequivocally, and without reservation. *Phillips v. State*, 701 S.W.2d 875, 889 (Tex.Cr.App.1985).

Additionally, the fact that no definition will be provided for a term does not render a prospective juror's understanding of that term irrelevant. To the contrary, that understanding becomes more crucial to the intelligent exercise of either the State's or the defendant's peremptory challenges because there is no definition to guide what could be a juror's skewed perception of the term.

*Id.*, 827 S.W.2d at 905–906.

In the instant case, the State does not argue that the objections should have been sustained. Indeed, the State seems to acknowledge that the trial judge erred in not permitting the questions but the State argues the error was harmless because Sorrell subsequently answered the questions posed by appellant and stated what deliberate meant to her:

> The terms [intentionally and deliberately] are so close. Intent meaning that you realize what's going to happen, that I don't know if the difference is in the malice involved or the amount of forethought in planning. That's the only thing that I can see is the difference between intent and deliberate.

In the instant case, as in *Woolridge*, I would hold the inquiry of Sorrell was proper because it sought to discover her views on an issue applicable to appellant's trial, was not repetitious, and was not in an improper form. However, since Sorrell eventually answered the question, appellant was not denied of his right to intelligently exercise his peremptory challenges.

With these comments, I concur only in the disposition of the seventh point of error and join the remainder of the opinion.